FILED

**McDERMOTT WILL & EMERY LLP**
DANIEL R. FOSTER (Bar No. 179753)
dfoster@mwe.com
MICHAEL R. O'NEILL (Bar No. 173342)
moneill@mwe.com
GREG D. YODER (Bar No. 274702)
gyoder@mwe.com
18191 Von Karman Avenue, Suite 500
Irvine, California 92612
Telephone:   (949) 851-0633
Facsimile:   (949) 851-9438

2011 FEB -2  PM 2: 05

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

Attorneys for Plaintiff
CEATS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

CEATS, INC.,

    Plaintiff,

  v.

RICHARD HALAVAIS,

    Defendant.

**SACV11 -0190 DOC (MLGx)**

CASE NO.

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff CEATS, Inc. ("CEATS"), by and through its counsel McDermott Will & Emery LLP, brings this action against defendant Richard Halavais ("Halavais") and alleges as follows:

## NATURE OF THE ACTION

1.    CEATS is the owner of several United States patents.  CEATS acquired its ownership rights in the patents from MS Intergate, Inc. ("MSI"), through valid patent assignments.  MSI, in turn, had gained its rights to the patents more than a decade ago through valid assignments from the patents' two named inventors, Halavais and Tony Chung ("Chung").

2.    In 2010, CEATS filed suit in the United States District Court for the Eastern District of Texas to enforce its patents against various airlines, ticket vendors, and

COMPLAINT FOR DECLARATORY RELIEF                     - 1 -                     (No. )

1   software companies. Suddenly, sensing the possibility for financial gain, Halavais

2   emerged and claimed to have an ownership interest in the CEATS patents. CEATS brings

3   this action to put an end to Halavais' specious claims which have no support whatsoever

4   in law or fact.

5                                          **THE PARTIES**

6         3.      CEATS is a Nevada corporation with its principal place of business in

7   Tyler, Texas.

8         4.      Upon information and belief, Halavais is a citizen of California residing in

9   San Diego, California.

10                              **JURISDICTION AND VENUE**

11        5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

12   The parties are citizens of different states, and the amount in controversy exceeds

13   $75,000. A real and justiciable case and controversy exists between the parties because

14   Halavais claims to have an ownership interest in patents that the United States Patent and

15   Trademark Office has recorded as being assigned to CEATS and that CEATS avers are

16   owned exclusively by CEATS. Halavais has filed an demand for arbitration against

17   CEATS and others seeking an arbitrator's declaration that Halavais has an ownership

18   interest in the CEATS patents. CEATS and Halavais, however, are not parties to any

19   agreement containing an arbitration clause. Indeed, CEATS and Halavais are not parties

20   to any agreement of any kind. Thus, the dispute between the parties relating to the

21   ownership of the CEATS patents is beyond the jurisdiction of an arbitrator.

22        6.      The Court has personal jurisdiction over Halavais because, among other

23   reasons, Halavais has done business in this judicial district, Halavais executed all of the

24   written agreements referenced herein in this judicial district (in particularly, in Orange

25   County, California), Halavais has instituted the above-referenced arbitration proceeding

26   against CEATS in this judicial district (in particularly, in Orange County, California), and

27   Halavais has harmed and continues to harm CEATS in California and in this judicial

28   district by, among other things, claiming an ownership interest in the CEATS patents.

**COMPLAINT FOR DECLARATORY RELIEF**                     - 2 -                              (No. )

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1      7.      Venue is proper in the Central District of California pursuant to 28 U.S.C.

2  § 1391(a) because a substantial part of the events or omissions giving rise to the claim

3  occurred in this judicial district.  All the agreements referenced herein were executed in

4  this judicial district, and the inventions claimed in the CEATS patents that are the subject

5  of this dispute were invented in this judicial district.

**FACTUAL ALLEGATIONS**

6

7      **A.**      **The Independent Contractor Agreement Between MSI and Halavais**

8      8.      On or about May 1, 1997, Milford Skane ("Skane"), doing business as MSI,

9  which had yet to be incorporated, entered into an "Independent Contractor Agreement"

10  with Halavais.  A true and correct copy of the Independent Contractor Agreement is

11  attached hereto as Exhibit A.  Pursuant to the terms of the agreement, Skane and Halavais

12  agreed that Halavais would perform networking and website design services, develop an

13  online ticketing and reservation system for Internet use, and "make application for letters

14  patent for same for which [Halavais] will assign said patent application to MSI or its

15  successors and assigns."  The agreement also provided: "As an independent contractor,

16  [Halavais] agrees that MSI retains all rights to work product developed under this

17  Agreement."

18      **B.**      **The Patent Application**

19      9.      On April 20, 1999, Halavais and co-inventor Chung executed an application

20  for a United States patent with the United States  Patent and Trademark Office, bearing

21  Serial No. 09/295,577 (the "Application").  MSI, however, paid for the preparation and

22  filing of the Application.

23      **C.**      **The Employment Agreements Between MSI and Halavais**

24      10.      By its terms, the Independent Contractor Agreement was set to expire on

25  June 30, 1999.  On or about June 13, 1999, MSI and Halavais entered into a

26  "Comprehensive Agreement Employment-at-Will and Arbitration" (the "Employment

27  Agreement").  A true and correct copy of the Employment Agreement is attached hereto

28  as Exhibit B.  The Employment Agreement provided that Halavais' employment and

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1   compensation by MSI could be terminated by either party at any time with or without

2   notice. Halavais hand wrote on each page of the Employment Agreement: "This does not

3   supersede the company prospectus or any other previously dated contract."

4         11.    Subsequently, MSI and Halavais entered into an "Employment Contract."

5   A true and correct copy of the Employment Contract is attached hereto as Exhibit C. By

6   its terms, the Employment Contract "supersedes and replaces any and all prior agreements

7   expressed or implied, written or oral, relating to employment between the parties."

8         12.    In Paragraph 9(a) of the Employment Contract, MSI and Halavais agreed:

9   "[MSI] shall be the sole owner of all the fruits and proceeds of [Halavais'] services

10   hereunder, including but not limited to, all ideas, concepts, formats, suggestions,

11   developments, . . . and other intellectual properties which [Halavais] may create in

12   connection with and during his term of employment hereunder, free and clear of any

13   claims by [Halavais] (or any other person claiming under [Halavais] of any kind

14   whatsoever (other than Halavais' right to compensation hereunder."

15         13.    In Paragraph 9(a) of the Employment Contract, MSI and Halavais further

16   agreed: "[Halavais] shall, at the request of [MSI], execute such assignments, certificates

17   or other such instruments as [MSI] may from time to time deem necessary or desirable to

18   evidence, establish, maintain, perfect, enforce or defend its right, title and interest in or to

19   any such properties."

20         14.    Paragraph 9(d) of the Employment Contract provides: "The covenants set

21   forth in the above paragraph shall survive the termination of this agreement."

22        **D.**    **The Assignment of the Patents**

23         15.    On or about April 14, 2000, Halavais and Chung executed an assignment for

24   the Application (the "Assignment"), through which they assigned the Application, and all

25   rights to and in the Application, to MSI. A true and correct copy of the Assignment is

26   attached hereto as Exhibit D.

27         16.    The Assignment states: "In consideration of good and valuable

28   consideration, the receipt of which is hereby acknowledged, we, the undersigned:

**COMPLAINT FOR DECLARATORY RELIEF**       - 4 -       (No. )

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1    Richard A. Halavais; Tony Chung hereby sell, assign, and transfer to MS Intergate,

2    Inc. . . . and its successors, assigns, and legal representatives, the entire right, title, and

3    interest for the United States and all foreign countries, in any and all improvements that

4    are disclosed in [the Application] and in and so said application, and all . . . continuing . . .

5    patent applications that have been or shall be filed in the United States . . . and in and to

6    all rights of priority resulting from the filing of United States application; agree that [MSI]

7    may apply for and receive a patent or patents for said improvements of its own name; and

8    that, when requested, . . . to carry out the intent and purpose of this Assignment, the

9    undersigned will execute all . . . continuing . . . patent applications on any and all said

10   improvements; execute all rightful oaths, assignments, powers of attorney, and other

11   papers; . . . and generally assist [MSI] its successors, assigns, or representatives in

12   securing and maintaining proper patent protection for said improvements and for vesting

13   title to said improvements, and all applications for patents and all patents on said

14   improvements, in [MSI], its successors, assigns, and legal representatives, . . . and that full

15   rights to convey the same as herein expressed is possessed by the undersigned."

16        **E.     The Separation Agreement Between MSI and Halavais**

17        17.     By mid-2000, Halavais had stopped performing any work for MSI, and

18   differences developed between MSI and Halavais as to how much Halavais was owed in

19   compensation.

20        18.     On or about May 2, 2000, MSI and Halavais executed a Separation

21   Agreement. CEATS cannot attach a copy of the Separation Agreement because it

22   contains a confidentiality provision. The purpose of the Separation Agreement was to

23   terminate Halavais' prior contractor and later employee relationship with MSI. In general

24   terms, MSI agreed to pay Halavais certain amounts over a period of time. MSI also

25   agreed to purchase a certain number of shares of MSI stock from Halavais' company. The

26   Separation Agreement also confirmed MSI's ownership of the Application and inventions

27   that Halavais had previously assigned to MSI. MSI fully complied with all of its duties

28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1 | and obligations to Halavais under the Separation Agreement, including making the initial
2 | payments due to Halavais and/or Halavais' company.

3 | **F.**     <u>The Financial Settlement Agreement Between MSI and Halavais</u>

4 | 19.    In late May or early June 2000, Halavais approached MSI. At that time,
5 | Halavais was in urgent need of money and wanted to renegotiate the payments due under
6 | the Separation Agreement.

7 | 20.    On or about June 2, 2000, Halavais and MSI negotiated and executed the
8 | "Financial Settlement Concerning Separation Agreement" ("Financial Settlement
9 | Agreement"). A true and correct copy of the Financial Settlement Agreement is attached
10 | hereto as Exhibit E. The Financial Settlement Agreement recited that MSI and Halavais
11 | had previously entered the Separation Agreement. The Financial Settlement Agreement
12 | further recited that Halavais had expressly requested that MSI pay to Halavais a set lump
13 | sum in full settlement of all of MSI's remaining financial obligations under the Separation
14 | Agreement.

15 | 21.    Paragraph 1 of the Financial Settlement Agreement provided that in
16 | exchange for payment by MSI to Halavais of $30,000 less withholding and garnishment,
17 | "all of [MSI's] obligations to [Halavais] (including but not limited to, those obligations to
18 | pay money described in Paragraph 4 of the Separation Agreement), shall be and are
19 | hereby fully satisfied and no further payments shall be due to [Halavais] from [MSI]."
20 | MSI fully complied with all of its duties and obligations to Halavais under the Financial
21 | Settlement Agreement, including making the $30,000 payment less withholdings and
22 | garnishment.

23 | **G.**     <u>The Stock Transfer Agreement Between MSI and Halavais</u>

24 | 22.    In late June 2000, Halavais again approached MSI. At that time, Halavais
25 | again was in urgent need of money and wanted to sell additional shares of MSI stock that
26 | were owned by Halavais' company.

27
28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

COMPLAINT FOR DECLARATORY
RELIEF       - 6 -       (No. )

1    23.    On or about June 29, 2000, MSI and Halavais executed the "Stock Transfer

2    Agreement." A true and correct copy of the Stock Transfer Agreement is attached hereto

3    as Exhibit F.

4    24.    Paragraph 1 of the Stock Transfer Agreement provided that Halavais'

5    company would sell 2 million shares of MSI stock to MSI for $2,000. MSI fully complied

6    with all of its duties and obligations to Halavais under the Stock Transfer Agreement,

7    including making the $2,000 payment.

8    **H.    The 2005 Stock Surrender Between MSI and Halavais**

9    25.    On or about April 14, 2005, Halavais executed an instrument entitled "Sale

10   of Stock back to MS Intergate Inc by Richard Halavais" ("2005 Stock Surrender"). A true

11   and correct copy of the 2005 Stock Surrender is attached hereto as Exhibit G. The 2005

12   Stock Surrender provided that Halavais surrendered his remaining shares of MSI stock in

13   exchange for $340. In the 2005 Stock Surrender, Halavais stated: "I also affirm that I no

14   longer have any ownership in or claim against MS InterGATE Inc. from this day

15   forward." MSI fully complied with all of its duties and obligations to Halavais under the

16   2005 Stock Surrender, including making the $340 payment.

17   **I.    The MSI Assignment and the CEATS Patents**

18   26.    Since the filing of the Application in 1999, MSI prosecuted the Application

19   before the United States Patent and Trademark Office ("USPTO"). MSI also filed and

20   prosecuted several continuation applications before the USPTO. Since his execution of

21   the Assignment, Halavais had nothing whatsoever to do with the prosecution of the

22   Application or the prosecution of any of the subsequent continuation applications.

23   27.    On October 14, 2008, MSI assigned the Application to CEATS ("MSI

24   Assignment"). A true and correct copy of the MSI Assignment is attached hereto as

25   Exhibit H. The MSI Assignment was filed with the USPTO.

26   28.    On November 18, 2008, the USPTO issued U.S. Patent No. 7,454,361 (the

27   "'361 patent"). The USPTO listed the inventors as Halavais and Chung and the assignee

28   as CEATS, which at the time was located in Irvine, California.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

**COMPLAINT FOR DECLARATORY
RELIEF**                        - 7 -                              (No. )

29.     Subsequently, the USPTO issued the following continuations to the '361 patent: U.S. Patent No. 7,454,361, U.S. Patent No. 7,548,866, U.S. Patent No. 7,548,869, U.S. Patent No. 7,548,870, U.S. Patent No. 7,660,728, U.S. Patent No. 7,660,729, and U.S. Patent No. 7,664,663. These patents, along with all other patents that subsequently issue and claim priority to the Application, are collectively referred to as the "CEATS Patents." True and correct copies of the seven CEATS Patents are attached hereto as Exhibits I-O, respectively.

30.     Each of the CEATS Patents lists the inventors as Halavais and Chung and the assignee as CEATS.

31.     Each of the CEATS Patents matured from the Application.

32.     MSI and later CEATS paid for all of the fees and costs associated with the filing and prosecution of the applications that matured into the CEATS patents. CEATS has paid all of the maintenance costs associated with each of the CEATS Patents..

**J.     The Texas Patent Infringement Action**

33.     On April 15, 2010, CEATS filed an action to enforce the CEATS Patents in the United States District Court for the Eastern District of Texas, Tyler Division, bearing Case No. 6:10-cv-120. In its complaint, CEATS correctly alleged that CEATS is the owner by assignment of the CEATS Patents.

**K.     Halavais' Assertion of an Ownership Interest in the CEATS Patents**

34.     On or about January 8, 2011, Halavais served CEATS with a document captioned "Claimant's Original Complaint in Arbitration" ("Arbitration Complaint"), which Halavais filed with the Judicial Arbitration and Mediation Service ("JAMS") in Irvine, California. The named respondents are MSI, CEATS, and Skane.

35.     In his Arbitration Complaint, Halavais requests declaratory relief regarding ownership of the CEATS Patents. Specifically, Halavais requests a declaration "that he continues to have an ownership interest in the [CEATS Patents] as an inventor of each and every patent comprising the [CEATS Patents]." Halavais alleges that he "retains to the present day his ownership interest as an inventor of the [CEATS Patents]."

COMPLAINT FOR DECLARATORY
RELIEF                              - 8 -                              (No. )

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

36. With respect to CEATS, Halavais alleges: "On information and belief, the legal successor to MSI is CEATS; as such, the allegations below that reference MSI and implied to and are the legal responsibility of CEATS."

37. CEATS is not the legal successor to MSI. CEATS is not and never has been MSI's successor. CEATS is the assignee of MSI's intellectual property rights, by virtue of an executed assignment and an asset purchase agreement.

38. CEATS is not a party to any of the agreements referenced herein between MSI and Halavais. CEATS has never entered into any contract or agreement with Halavais. Accordingly, CEATS has never agreed to arbitrate any issues or controversies between CEATS and Halavais.

## COUNT I

## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

39. The allegations of the foregoing paragraphs are incorporated herein as if separately realleged.

40. CEATS is the lawful owner of the CEATS Patents.

41. Halavais has no ownership rights in the CEATS Patents. Halavais has never had any ownership rights in the CEATS Patents by virtue of the Independent Contractor Agreement, which provided that Halavais would "make application for letters patent for same for which [Halavais] will assign said patent application to MSI or its successors and assigns," and which further provides, at Paragraph 8: "As an independent contractor, [Halavais] agrees that MSI retains all rights to work product developed under this Agreement."

42. The Application from which the CEATS Patents arose was completed during the time Halavais was an independent contractor, before he became an employee. But in any event, Halavais also had no ownership rights in intellectual property developed by Halavais as an employee of MSI, pursuant to the Employee Contract, which provides, at Paragraph 9(a): "[MSI] shall be the sole owner of all the fruits and proceeds of [Halavais'] services hereunder, including but not limited to, all ideas, concepts, formats,

COMPLAINT FOR DECLARATORY
RELIEF
- 9 -
(No. )

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

1  suggestions, developments, . . . and other intellectual properties which [Halavais] may

2  create in connection with and during his term of employment hereunder, free and clear of

3  any claims by [Halavais] (or any other person claiming under [Halavais] of any kind

4  whatsoever (other than Halavais' right to compensation hereunder."

5       43.    To whatever extent Halavais may have retained any ownership rights in the

6  CEATS Patents, notwithstanding the Independent Contractor Agreement and the

7  Employment Contract (and CEATS contends that he did not retain any such ownership

8  interest), he transferred those rights to MSI when he executed the Assignment on or about

9  April 14, 2000.  MSI later transferred those rights to CEATS by way of the MSI

10  Assignment.

11       44.    The Separation Agreement further confirms that Halavais has no ownership

12  rights in the CEATS Patents.

13       45.    In his arbitration complaint, Halavais contends that his assignment of the

14  Application to MSI was contingent upon his receipt of funds under the Separation

15  Agreement, which he contends he never received.  However, Halavais neglected to

16  mention that MSI did make all of the initial payments due under the Separation

17  Agreement.  Halavais also neglected to mention that the MSI and Halavais entered the

18  Financial Settlement Agreement, in which Halavais accepted a $30,000 payment and

19  agreed that "no further payments shall be due to [Halavais] from [MSI]" under the

20  Separation Agreement  Additionally, as alleged above, Halavais had no ownership rights

21  in the CEATS Patents to begin with, and if he had possessed any such rights, they were

22  signed away by the Assignment.

23       46.    Halavais has wrongly claimed that he has an ownership interest in the

24  CEATS Patents.  CEATS is entitled to a declaratory judgment that CEATS is the owner of

25  the CEATS Patents and that Halavais has no ownership interest or ownership rights in the

26  CEATS Patents.

27       47.    Pursuant to 28 U.S.C. § 2201, this Court should issue said declaratory

28  judgment.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

**COMPLAINT FOR DECLARATORY RELIEF**    - 10 -    (No. )

## PRAYER

WHEREFORE, CEATS requests the following relief:

1.     A declaratory judgment that CEATS is the owner of all rights, title, and interest in the CEATS Patents (U.S. Patent No. 7,454,361, U.S. Patent No. 7,548,866, U.S. Patent No. 7,548,869, U.S. Patent No. 7,548,870, U.S. Patent No. 7,660,728, U.S. Patent No. 7,660,729, U.S. Patent No. 7,664,663, and all other patents that subsequently issue and claim priority to U.S. patent application Serial No. 09/295,577);

2.     A declaratory judgment that Richard Halavais has no ownership interest in the CEATS Patents (U.S. Patent No. 7,454,361, U.S. Patent No. 7,548,866, U.S. Patent No. 7,548,869, U.S. Patent No. 7,548,870, U.S. Patent No. 7,660,728, U.S. Patent No. 7,660,729, U.S. Patent No. 7,664,663), and all other patents that subsequently issue and claim priority to U.S. patent application Serial No. 09/295,577);

3.     An award to CEATS of all costs of suit incurred herein, and

4.     An award to CEATS of such other relief as the Court deems necessary and proper.

## DEMAND FOR JURY TRIAL

CEATS hereby demands a trial by jury on all issues so triable.

Dated: February ___, 2011

McDERMOTT WILL & EMERY LLP

By: _____
MICHAEL R. O'NEILL
Attorneys for Plaintiff CEATS, INC.

DM_US 27627359-2.086484.0011

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

COMPLAINT FOR DECLARATORY
RELIEF
    - 11 -
(No. )

# EXHIBIT A

INDEPENDENT CONTRACTOR AGREEMENT

By and between Milford Skane DBA MS Intergate, hereinafter referred to as MSI, and Richard Halavais as an independent contractor, hereinafter referred to as RAH.

Our independent contractor agreement is as follows:

1. MSI is an internet service provider and RAH is a consulting engineer who performs services for other clients. We have agreed RAH will do the following for MSI as an independent contractor:
   (a)      Such networking and web site design as may from time to time be necessary to the business of MSI.
   (b)      Develop an online ticketing and reservation system for internet use and make application for letters patent for same for which RAH will assign said patent application to MSI or its successors and assigns.

2. This contract shall begin on May 1, 1997 and end on June30, 1999, but either party may cancel this agreement for cause by giving 30 days written notice to the other along with the reason.

3. RAH will be paid the whole sum of five-hundred-thirty-thousand ($530,000.00) dollars upon completion under such terms and conditions as to not negatively impact the operations of the business. RAH is not entitled to any company benefits, such as medical insurance or retirement, other than this compensation, because he is not an employee

4. RAH is responsible for all expenses, personnel, tools, and equipment-- including any repairs--needed to fully perform these services. MSI is not responsible for payroll, income, and unemployment tax deductions/payments due to these services, because he is not an employer of RAH.  Additionally, RAH will be granted a per diem allowance in the amount of five-hundred ($500.00) dollars weekly during the term of this agreement.

5. RAH shall carry at his cost during this contract all necessary workers' compensation insurance covering you and your employees, as well as property, bodily injury, and errors and omissions (and/or general liability) insurance of at least $ (list minimum amounts to be carried), which policies shall also name MSI as an additional insured.

6. RAH shall fully comply with all applicable federal, state, and local laws and regulations during this time.

7. RAH shall keep all information about the business of MSI confidential, disclosing it to no one without my express written consent.

8. As an independent contractor, RAH agrees that MSI retain all rights to work product developed under this agreement:

9. RAH assumes liability for all claims and liabilities arising out of his services performed and fully indemnifies MSI against all damages, attorney fees, and out-of-pocket costs incurred due to his work.

10. If RAH believes he is being discriminated against, sexually harassed, or exposed to any unlawful or unethical condition, he will report this situation to MSI immediately.

Complaint, Exh. A, p.12

11. Any dispute over this contract shall be submitted to binding arbitration under the rules of The American Arbitration Association or other such applicable entity and the prevailing party shall be entitled to receive reasonable attorney fees and costs as set by the arbitrator

In acceptance of this agreement, the undersigned have set their hand this 1st day of May, 1997

_____
Milford Skane dba MS Intergate

_____
Richard Halavais

# EXHIBIT B

## COMPREHENSIVE AGREEMENT
## EMPLOYMENT AT-WILL AND ARBITRATION *A*

1.     It is hereby agreed by and between RICHARD HOLAVA (hereinafter "Employee") and MS Intergate, Inc. (hereinafter "Employer") that the employment and compensation of Employee can be terminated by the Employer or the Employee at any time, with or without cause and/or with or without notice, at the option of the Employer or the Employee. _____ (employee initials)

2.     It is further agreed and understood that any agreement contrary to the foregoing must be entered into, in writing, by the President of the Employer.  No supervisor or representative of the Employer, other than its President, has any authority to enter into any agreement for employment for any specified period of time or make any agreement contrary to the foregoing.  Oral representations made before or after you are hired do not alter this Agreement. _____ (employee initials)

3.     I agree that any claim, dispute, or controversy (including, but not limited to, any and all claims of discrimination and harassment) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (or its owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers Compensation Act, and Employment Development Department claims), shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act (Cal. Code Civ. Proc. sec 1280 et seq., including section 1283.05 and all of the act's other mandatory and permissive rights to discovery); provided, however, that: In addition to requirements imposed by law, any arbitrator herein shall be a retired California Superior Court Judge and shall be subject to disqualification on the same grounds as would apply to a judge of such court.  To the extent applicable in civil actions in California courts, the following shall apply and be observed: all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure Section 631.8.  Resolution of the dispute shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis (including but not limited to, notions of "just cause") other than such controlling law.  The arbitrator shall have the immunity of a judicial officer from civil liability when acting in the capacity of an arbitrator, which immunity supplements any other existing immunity.  Likewise, all communications during or in connection with the arbitration proceedings are privileged in accordance with Cal. Civil Code Section 47(b).  As reasonably required to allow full use and benefit of this agreement's modifications to the act's procedures, the arbitrator shall extend the times set by the act for the giving of notices and setting of hearings.  Awards shall include the arbitrator's written reasoned opinion and, at either party's written request within 10 days after issuance of the award, shall be subject to reversal, remand or modification following review of the record and arguments of the parties by a second arbitrator who shall, as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial.  Should any portion, word, clause, phrase, sentence or paragraph of this Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.  I understand by agreeing to this binding arbitration provision, both I and the Company give up our rights to trial by jury. _____ (employee initials)

4.     This is the entire agreement between Employer and Employee regarding the length of employment and reasons for termination of employment, and this agreement supersedes any and all prior agreements regarding these issues. _____ (employee initials)

MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS.

Signed at ANAHEIM, California, this 13 day of JUNE , 1990

MS Intergate, Inc.

_____
Employee's Signature

Complaint, Exh. B, p.14

*This does not supercede the company prospectus or any other previously dated contracts. RO

In the event of my employment to a posi.....n this Company, I will comply with all rules and ....gulations of this Company. I understand that the Company reserves the right to require me to submit to a test for the presence of drugs in my system prior to employment and at any time during my employment, to the extent permitted by law. I also understand that any offer of employment may be contingent upon the passing of a physical examination. I consent to the disclosure of the results of any physical examination and related tests to the Company. I also understand that I may be required to take other tests such as personality and honesty tests, prior to employment and during my employment. I understand that should I decline to sign this consent or decline to take any of the above tests, my application for employment may be rejected or my employment may be terminated. I understand that bonding may be a condition of hire. If it is, I will be so advised either before or after hiring and a bond application will have to be completed.

I understand that the company may investigate my driving record and my criminal record and that an investigative consumer report may be prepared whereby information is obtained through personal interviews with my neighbors, friends, personal references, and others with whom I am acquainted. This inquiry includes information as to my character, general reputation, personal characteristics and mode of living. I understand that I have the right to make a written inquiry within a reasonable period of time to receive additional detailed information about the nature and scope of this investigation. I further understand that the Company may contact my previous employers and I authorize those employers to disclose to the Company all records and information pertinent to my employment with them. In addition to authorizing the release of any information regarding my employment, I hereby fully waive any rights or claims I have or may have against my former employers, their agents, employees and representatives, as well as other individuals who release information to the Company, and release them from any and all liability, claims, or damages that may directly or indirectly result from the use, disclosure, or release of any such information by any person or party, whether such information is favorable or unfavorable to me. I authorize the persons named herein as personal references to provide the Company with any pertinent information they may have regarding myself.

BY SIGNING BELOW, I AUTHORIZE THE COMPANY TO OBTAIN A CONSUMER CREDIT REPORT ON ME. I ALSO ACKNOWLEDGE AND CERTIFY THAT I HAVE BEEN GIVEN PRIOR WRITTEN NOTIFICATION THAT A CONSUMER CREDIT REPORT MAY BE OBTAINED ON ME AND THAT I HAVE BEEN GIVEN A COPY OF SAID WRITTEN NOTIFICATION.

I hereby state that all the information that I provided on this application or any other documents filled out in connection with my employment, and in any interview is true and correct. I have withheld nothing that would, if disclosed, affect this application unfavorably. I understand that if I am employed and any such information is later found to be false or incomplete in any respect, I may be dismissed.

If hired, I agree as follows: My employment and compensation is terminable at-will, is for no definite period, and my employment and compensation may be terminated by the Company (employer) at any time and for any reason whatsoever, with or without good cause at the option of either the Company or myself. No implied, oral, or written agreements contrary to the express language of this agreement are valid unless they are in writing and signed by the President of the Company (or majority owner or owners if Company is not a corporation). No supervisor or representative of the Company, other than the President of the Company (or majority owner or owners if Company is not a corporation), has any authority to make any agreements contrary to the foregoing. This agreement is the entire agreement between the Company and the employee regarding the rights of the Company or employee to terminate employment with or without good cause, and this agreement takes the place of all prior and contemporaneous agreements, representations, and understandings of the employee and the Company.

I agree that any claim, dispute, or controversy (including, but not limited to, any and all claims of discrimination and harassment) which would otherwise require or allow resort to any court or other governmental dispute resolution forum between myself and the Company (or its owners, directors, officers, managers, employees, agents, and parties affiliated with its employee benefit and health plans) arising from, related to, or having any relationship or connection whatsoever with my seeking employment with, employment by, or other association with the Company, whether based on tort, contract, statutory, or equitable law, or otherwise, (with the sole exception of claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under the California Workers Compensation Act, and Employment Development Department claims), shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act, in conformity with the procedures of the California Arbitration Act (Cal. Code Civ. Proc. sec 1280 et seq., including section 1283.05 and all of the act's other mandatory and permissive rights to discovery); provided, however, that: In addition to requirements imposed by law, any arbitrator herein shall be a retired California Superior Court Judge and shall be subject to disqualification on the same grounds as would apply to a judge of such court. To the extent applicable in civil actions in California courts, the following shall apply and be observed: all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure Section 631.8. Resolution of the dispute shall be based solely upon the law governing the claims and defenses pleaded, and the arbitrator may not invoke any basis (including but not limited to, notions of "just cause") other than such controlling law. The arbitrator shall have the immunity of a judicial officer from civil liability when acting in the capacity of an arbitrator, which immunity supplements any other existing immunity. Likewise, all communications during or in connection with the arbitration proceedings are privileged in accordance with Cal. Civil Code Section 47(b). As reasonably required to allow full use and benefit of this agreement's modifications to the act's procedures, the arbitrator shall extend the times set by the act for the giving of notices and setting of hearings. Awards shall include the arbitrator's written reasoned opinion and, at either party's written request within 10 days after issuance of the award, shall be subject to reversal, remand or modification following review of the record and arguments of the parties by a second arbitrator who shall, as far as practicable, proceed according to the law and procedures applicable to appellate review by the California Court of Appeal of a civil judgment following court trial. Should any portion, word, clause, phrase, sentence or paragraph of this Agreement be declared void or unenforceable, such portion shall be considered independent and severable from the remainder, the validity of which shall remain unaffected.

I UNDERSTAND BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH I AND THE COMPANY GIVE UP OUR RIGHTS TO TRIAL BY JURY.

*If you have any questions regarding this statement, please ask a Company representative before signing. I hereby acknowledge that I have read the above statements and understand the same.*

DO NOT SIGN UNTIL YOU HAVE READ THE ABOVE STATEMENT & AGREEMENT

_____          6/13/1999
SIGNATURE OF APPLICANT                                             DATE

Complaint, Exh. B, p.15

*This does not supercede the company prospectus or any other previously dated contracts. P.S.

# EXHIBIT C

# EMPLOYMENT CONTRACT

This Agreement (hereinafter referred to as "the Agreement") by and between MS Intergate, Inc., a Nevada corporation whose executive offices are located at 5100 E. La. Palma Ave., Suite 202, Anaheim Hills, California 92807 (hereinafter called "the Company") and Richard A. Halavais of Anaheim Hills, California (hereinafter called "the Employee") witnesseth:

1. Upon execution by the parties this Agreement supercedes and replaces any and all prior agreements expressed or implied, oral or written, relating to employment between the parties.

2. (a) The Company hereby employs the Employee for a term of five (5) years commencing upon the date of last execution of this Agreement.

   (b) In addition, the Company shall have five (5) irrevocable one-year options, exercisable at the sole discretion of the company, to employ the Employee for five (5) one (1) year additional periods, upon written notice duly signed by an authorized representative of the Company and delivered to the Employee no less that ninety (90) days prior to the expiration of the initial or subsequent option employment term, as applicable.

3. In the event the Employee continues in the employ of the Company after the end of the initial term and the Company has not exercised its option or if the Employee remains employed by the Company after the expiration of the Option Period(s), your employment shall be solely on an at-will basis. This means that during any and all periods of time outside those expressly covered herein, the Employee may resign or the Company may terminate his employment with or without cause and with or without advance notice. During any such period of at-will employment, the Employee will be paid at the weekly salary rate paid to the Employee during his last regular pay period and will receive such bonuses and benefits as last in effect during his last regular pay period hereunder

4. The Employee shall perform such duties consistent with the position set forth in Paragraph 5 (a) as are assigned to him from time to time including but not limited to travel within and outside the United States and shall be determined by the Company to be desirable.

5. (a) The Employee shall serve as Vice President of the Company.

   (b) If the employee is elected a member of the Board of Directors or to any other office of the Company or any of its affiliates, he agrees to serve in such capacity or capacities with compensation equivalent to that of all others serving in such capacity.

6. By execution hereof the Employee accepts employment by the Company and agrees to devote his full time and attention as necessary to fulfill all of the duties of his employment hereunder.

7. As compensation for his services, the Company throughout the term of his employment described in Paragraph 2(a) herein, on regular pay dates as then in effect under Company policy, pay Employee at the rate of:

   (a) $240,000 per annum commencing July 1, 1999 and continuing until August 31, 1999.

1

(b) $360,000 per annum commencing September 1, 1999 and continuing until December 31, 1999.

(c) $480,000 per annum commencing January 1, 2000 and continuing until June 30, 2000.

(d) $600,000 per annum commencing July 1, 2000 and continuing throughout the remaining term of his employment with annual increases equal to ten (10%) percent of Employees last base salary.

(e) A weekly salary equal to Employees last base salary, prorated, for any period for which the Employee is employed as an at-will employee of the Company.

(f) A Christmas bonus, payable on or before December 1 of the current year, in an amount to be determined by the Board of Directors as reasonable and prudent.

(g) Such other bonuses as deemed reasonable and prudent by action of the Board of Directors.

8. Employee will not, during his term of employment hereunder and for a period of two (2) years thereafter, directly or indirectly, induce or solicit or attempt to induce or solicit any managerial, sales or supervisory employee of the Company or any of its affiliates to render services to any other person, firm or corporation.

9. (a) Employee acknowledges that the relationship between the parties hereto is exclusively that of employer and employee and that the Company's obligation to the Employee are exclusively contractual in nature. The Company shall be the sole owner of all the fruits and proceeds of Employee's services hereunder, including but not limited to, all ideas, concepts, formats, suggestions, developments, arrangements, designs, packages, programs, promotions and other intellectual properties which Employee may create in connection with and during his term of employment hereunder, free and clear of any claims by Employee (or any other person claiming under Employee) of any kind whatsoever (other than Employees right to compensation hereunder). Employee shall, at the request of the Company, execute such assignments, certificates or other such instruments as the Company may from time to time deem necessary or desirable to evidence, establish, maintain, perfect, protect, enforce or defend its right, title and interest in or to any such properties.

(b) All memoranda, notes, records and other documents made or complied by Employee or made available to Employee during the term of this Agreement or subsequently during any at-will employment period concerning the business of the Company or its affiliates shall be the Company's property and shall be delivered to the Company on the termination of this Agreement or at any other time upon request. Employee shall keep in confidence and shall not use for himself or others, or divulge to others, any information concerning the business of the Company or its affiliates which is not otherwise publicly available and which is obtained by Employee as a result of his employment, including but not limited to, trade secrets or processes and information deemed by the Company to be proprietary in nature, unless disclosure is made pursuant to written approval by the Company or is required by law.

(c) The Company shall have the right to use Employees name, biography and likeness in connection with its business, including in advertising its products and services, and may grant this right to others, but not for use as a direct endorsement.

2

(d) The covenants set forth above in this paragraph shall survive the termination of this Agreement.

10. Employee shall be eligible to participate in all employee benefits plans of the Company available to other comparable executives of the Company, and his eligibility to participate in such plans shall be governed by the rules applicable to comparable executives.

11. In addition to those benefits offered in Paragraph 10, the following are provided:

(a) Annual paid vacation of four (4) weeks increasing yearly by one-week to a maximum of eight (8) weeks of paid vacation per year.

(b) The Company shall pay all premiums of group health, group dental and group vision for Employee and his immediate family. The Company shall pay all premiums for an individual term life insurance policy in the face amount of $500,000 with the beneficiary being the Employees spouse or his estate. The Company shall pay all premiums for an individual non-revocable guaranteed renewable disability policy with a monthly guarantee for life starting ninety days after disability with a monthly benefit from said policy in the amount of $10,000 per month.

(c) An executive medical reimbursement provision by the Company shall repay to the Employee all out of pocket expenses incurred in connection with the deductible, stop loss, copay or any other out of pocket expenses associated with the Company's health, dental or vision insurance coverage.

(d) The Company shall make available to the Employee during the first year of employment the following benefits: 401(k) retirement plan, a deferred compensation plan, a defined benefit retirement plan or any other retirement program offered by the Company.

(e) A car allowance of $1,500 per month, increasing 10% annually, will be given Employee beginning July 1, 1999 and will continue through the term of employment.

(f) Business travel and entertainment expenses incurred and associated with Company business will be reimbursed to Employee in full.

12. The services to be furnished by Employee hereunder and the rights and privileges granted to the Company by the Employee are of a special, unique, unusual, extraordinary, and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law, and a breach by employee of any of the provisions contained herein will cause the Company irreparable injury and damage. The Employee expressly agrees that the Company shall be entitled to seek injunctive and other equitable relief to prevent a breach of this Agreement by Employee. Resort to such equitable relief, however, shall not be construed as a waiver of any preceding or succeeding breach of the same or any other term or provision. The various rights and remedies of the Company hereunder shall be construed to be cumulative and no one of them shall be exclusive of any other or of any right or remedy allowed by law.

13. In consideration of making this Agreement, as well as of the other consideration stated herein, Employee expressly agrees that any contract, agreement or understanding between Employee and the Company with respect to severance or termination pay or limitations on termination previously made to Employee whether by way of contract, letter or Company Termination Policy, is hereby superceded. Employee further agrees that if he continues in the employ of the

3

Company after the end of this Agreement in accordance with the provisions of such then existing Company policies as may then be in effect applicable to comparable executives shall apply equally to Employee.  The terms and conditions of this Agreement are in effect upon execution and are payable by the Company for the initial term and any option exercised and remain in effect if employee is terminated.

14. This agreement shall be governed by the laws of the State of California applicable to contracts performed entirely therein.

15. This Agreement shall inure to the benefit of the successors and general assigns of the Company and to the benefit of any other corporation or entity which is a parent, subsidiary or affiliate of the Company to which the Agreement is assigned, and any other corporation or entity into which the Company may be merged or with which it may be consolidated.  Except as herein provided, this Agreement shall be non-assignable.

MS Intergate, Inc.

By: _____       By: _____

_____

Milford R. Skane

(name)       (name)

President

(title)       (title)

By: _____

(employee)

4       Complaint, Exh. C, p.19

# MS Intergate, Inc.

1999 1099 Amounts and Consequences of Reporting as Wages - Revised

| Employee | 1099 Amt | FIT | OASDI | Medicare | FUTA | PIT | SDI | ETT | SDI | Total Tax | GU Portion | Gross |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lynette Rogers | 4,583.00 | - | 568.29 | 132.91 | 36.66 | - | 155.82 | 4.58 | 22.92 | 921.18 | 651.72 | 5,234.72 |
| Milford Skane | 18,546.14 | - | | 537.84 | 17.60 | - | 74.80 | 2.20 | 11.00 | 537.84 | 272.88 | 18,819.02 |
| Harry Davidson | 2,200.00 | - | 272.80 | 63.80 | | - | | | | 442.20 | 312.85 | 2,512.85 |
| Richard Halavais | 57,768.36 | | 1,957.21 | 1,675.28 | | | | | | 1,675.28 | 849.97 | 58,618.33 |
| Tony Chung | 15,783.98 | | | 457.74 | 48.06 | | 204.24 | 6.01 | 30.04 | 2,414.95 | 232.24 | 16,016.22 |
| Maggie St Thomas | 6,007.00 | - | 744.87 | 174.20 | | - | | | | 1,207.41 | 854.22 | 6,861.22 |
| **TOTALS** | 104,888.48 | - | 3,543.17 | 3,041.77 | 102.32 | - | 434.86 | 12.79 | 63.95 | 7,198.86 | 3,173.87 | 108,062.35 |

**With Richard Halavais**

| | |
|---|---|
| Total Tax Due | 7,198.86 |
| Gross-up portion | 3,173.87 |
| Penalty (50%) | 3,599.43 |
| **Total Potential Liability** | **13,972.16** |

**Without Richard Halavais**

| | |
|---|---|
| Total Tax Due | 5,523.58 |
| Gross-up portion | 2,323.91 |
| Penalty (50%) | 2,761.79 |
| **Total Potential Liability** | **10,609.27** |

Employee plus employer portions

1099 Amts for Employees revised.xls

10/1/99

Complaint, Exh. C, p.20

# EXHIBIT D



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

JULY 17, 2000

BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN
THOMAS M. COESTER
12400 WILSHIRE BOULEVARD, 7TH FLOOR
LOS ANGELES, CA 90025

*101359504A*

04456 P001 TMC
MS Intergate, Inc.

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT AND TRADEMARK OFFICE,
ASSIGNMENT DIVISION, BOX ASSIGNMENTS, CG-4, 1213 JEFFERSON DAVIS HWY,
SUITE 320, WASHINGTON, D.C. 20231.

RECORDATION DATE: 05/01/2000        REEL/FRAME: 010784/0261
                                    NUMBER OF PAGES: 3

BRIEF:  ASSIGNMENT OF ASSIGNOR'S INTEREST (SEE DOCUMENT FOR DETAILS).

ASSIGNOR:
  HALAVAIS, RICHARD A.              DOC DATE: 04/14/2000

ASSIGNOR:
  CHUNG, TONY C.                    DOC DATE: 04/14/2000

ASSIGNEE:
  MS INTERGATE, INC.
  5100 EAST LA PALMA AVENUE, SUITE
    202
  ANAHEIM HILLS, CALIFORNIA 92807

SERIAL NUMBER: 09295577             FILING DATE: 04/22/1999
PATENT NUMBER:                      ISSUE DATE:

ENTERED

JUL 2 4 2000

STATUS DB-14